UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TRELLIS L. PRESSLEY,

                                    Petitioner,

                                                        Case # 20-CV-6428-FPG
v.                                                      DECISION AND ORDER


JOHN G. RICH, *Superintendent, Elmira Correctional Facility*,

                                    Respondent.


## INTRODUCTION

Pursuant to 28 U.S.C. § 2254, Petitioner Trellis L. Pressley brings this habeas petition to challenge his state-court convictions for first-degree rape and third-degree criminal sexual act. ECF No. 1.  Respondent Superintendent John G. Rich opposes the petition.  ECF Nos. 21-2, 28. For the reasons that follow, Petitioner's request for habeas relief is DENIED, and the petition is DISMISSED.

## BACKGROUND

In April 2012, Petitioner was indicted in New York on charges of (1) first-degree rape, in violation of N.Y. Penal Law § 130.35(1), (2) first-degree criminal sexual act, in violation of Penal Law § 130.50(1), (3) third-degree rape, in violation of Penal Law § 130.25(3), and (4) third-degree criminal sexual act, in violation of Penal Law § 130.40(3).  S.R. at 74-75.[1]  The charges arose out of Plaintiff's alleged rape of an individual, whom the Court refers to as "B.C.," in March 2012. *Id.*

---

[1] The State Court Record is docketed at ECF No. 21-1 and referenced as "S.R."  The Court cites the page numbers listed in the record.

## I.    Pretrial Proceedings

On April 6, 2012, Petitioner was arraigned in Monroe County Court.  Tr. 3.[2]  Petitioner was represented by assigned counsel Michael Lopez.  *Id.* at 3-4.  On April 24, 2012,  Petitioner appeared before Supreme Court Justice Francis A. Affronti.  *Id.* at 12-13.  At that appearance, Petitioner alleged that Attorney Lopez was "incompetent" and stated that he had retained a new attorney, Aaron Sperano.  *See id.* at 13.  Attorney Sperano appeared with Petitioner at the next appearance on May 8, 2012.  *Id.* at 17.  Attorney Lopez was discharged.  *Id.*  On May 15, 2012, Justice Affronti set bail.  *See id.* at 20-26.  On May 29, 2012, Attorney Sperano filed an omnibus pretrial motion, requesting discovery and raising certain pretrial issues for adjudication.  *See* S.R. at 97-116.

On July 18, 2012, the parties appeared before Justice Affronti for combined *Huntley*,[3] *Wade*,[4] and *Dunaway*[5] hearings.  Before the matter could begin, Petitioner "object[ed] to this whole hearing" and asked to "get rid of [his] attorney."  Tr. 37.  Petitioner requested one week to find a new attorney.  *Id.* at 39.  Attorney Sperano stated that he maintained a "decent working relationship" with Petitioner but that he would accede to Petitioner's request if he wanted new representation.  *Id.* at 40. Justice Affronti granted Petitioner's request for a one-week adjournment, but he warned Petitioner that pretrial proceedings would continue thereafter "whether [he] [is]

---

[2] The transcript is docketed at ECF No. 21 and referenced as "Tr."  The Court cites the page numbers identified in the ribbon of the Court's electronic filing system.

[3] "A pretrial hearing pursuant to *People v. Huntley*, [15 N.Y.2d 72 (1965)], is held to determine the voluntariness of inculpatory statements made by a criminal defendant to law enforcement officers."  *Torres v. Ecole*, No. 06-CV-674, 2009 WL 4067281, at *1 n.2 (S.D.N.Y. Nov. 24, 2009).

[4] "The purpose of a *Wade* hearing is to determine [before] the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." *Lynn v. Bliden*, 443 F.3d 238, 248 (2d Cir. 2006).

[5] "The purpose of a pretrial hearing pursuant to *Dunaway v. New York*, [442 U.S. 200 (1979)], is to determine whether probable cause existed for a criminal defendant's arrest."  *Quinney v. Conway*, 784 F. Supp. 2d 247, 263 n.2 (W.D.N.Y. 2011).

represented by an attorney or not." *Id.* Petitioner acknowledged Justice Affronti's warning that he would be "representing [himself]" if he did not retain new counsel by "this time next week." *Id.* at 42-43. With that understanding, Justice Affronti discharged Attorney Sperano as Petitioner's retained counsel. *Id.* at 44.

At a hearing held on July 25, 2012, Petitioner appeared without counsel. Tr. 45. Petitioner protested that he was unable to obtain new counsel because attorneys would not accept his phone calls from the jail. *See id.* at 48-49. Justice Affronti permitted Petitioner to make one telephone call through a courthouse phone. *Id.* at 53-54. He then permitted another adjournment so as to allow Petitioner another opportunity to contact an attorney. *Id.* at 54-55. Justice Affronti again warned, however, that if Petitioner were unable to find new counsel, he would be "representing [him]self." *Id.* at 54, 58.

On August 16, 2012, Petitioner appeared before Justice Affronti without counsel. Justice Affronti set forth his findings as to why he would deem Petitioner to be proceeding *pro se* "at all future proceedings." *Id.* at 66. Justice Affronti explained Petitioner's obligations with respect to the law and rules of evidence. *Id.* He concluded, "[B]eing previously advised and also in light of the statements that you made earlier regarding your obvious awareness of the earlier Court proceedings . . . it is my belief that you have made a determined and clearly thought out decision to represent yourself." Tr. 67.

Justice Affronti proceeded to the merits of some of the outstanding issues identified by Attorney Sperano in his omnibus motion. Justice Affronti determined that there was no need for a *Dunaway* hearing because "there is no evidence to ultimately suppress." *Id.* at 72. Justice Affronti then held a *Huntley* hearing, during which Petitioner made several outbursts and denied that he had decided to represent himself. *Id.* at 73-74. The State called Darrel Schultz, a police

officer with the Rochester Police Department, to testify.  *Id.* at 76.  He recounted that on March 21, 2012, he was in the area of the "three hundred block . . . of Melville" looking for Pressley, "who was . . . . wanted for a possible rape."  *Id.* at 77-78.  Officer Schultz had seen Petitioner's photograph earlier in the day during roll call.  *Id.* at 78.  While on patrol, Officer Schultz observed a person walking who matched Petitioner's description and pulled his car to the side of the road to speak with the individual.  *Id.* at 78-79.  The individual said his name was "Tyrone Spinx."  Tr. 79.  Officer Schultz asked the individual where he was going, and the individual "pointed northbound on Greely Street" while stating that he was "headed toward Woodward Street," which lay in a different direction.  *Id.*  Officer Schultz exited his car, conducted a pat frisk, and placed the individual in the car.  While another officer was en route with a photograph of Petitioner, Officer Schultz asked Petitioner to spell his last name.  Officer Schultz testified that when "[h]e tried to spell Spinx, [] it wasn't coming out like somebody who actually had the name Spinx.  He was having a hard time spelling it."  *Id.*  The other officer arrived and confronted Petitioner with his photograph.  Petitioner reportedly "let out a sigh and said it was him."  *Id.*  Officer Schultz placed handcuffs on Petitioner and transported him to a local station.  While en route, Petitioner "asked [Officer Schultz] several times . . . what this was all about."  Tr. 80.  Officer Schultz responded that he was "not sure at this time, but an Investigator wants to speak with him."  *Id.* Petitioner continued to ask, and Officer Schultz testified that "eventually he did ask if this was about a rape or the rape."  *Id.*  Officer Schultz responded that he "believed it was[] but [] wasn't sure."  *Id.*

Once the direct examination of Officer Schultz concluded, Petitioner made "an obscene gesture" towards him.  *Id.* at 82. As Officer Schultz left the courtroom, Petitioner made a comment to him that, in Justice Affronti's view, was "not complimentary in nature."  *Id.* at 83.  Justice

Affronti then proceeded to oral argument, during which Petitioner called the complainant a "compulsive liar." Tr. 84. Justice Affronti ordered that Petitioner be removed from the courtroom in light of his "derogatory comments." *Id.*

Outside Petitioner's presence, Justice Affronti ruled on two pending issues. First, he ruled that Petitioner's inculpatory statement to Officer Schultz was "not the product of custodial interrogation but [was] wholly voluntary, self-generated, and spontaneous." *Id.* at 87. As a result, the statement was admissible at trial notwithstanding the absence of *Miranda* warnings. Second, he granted the State's motion to compel a buccal swab of Petitioner for purposes of DNA testing. *See id.* at 85, 87-88; S.R. at 151-54.

On October 4, 2012, the parties appeared before Justice Affronti for the *Wade* hearing. Tr. 90-92. At Justice Affronti's request, Attorney Sperano appeared for the hearing. *Id.* at 92. He intended for Attorney Sperano to either represent Petitioner or at least act as standby counsel. *Id.* at 92-93. Petitioner refused to permit Attorney Sperano to represent him. *Id.* at 98.

The hearing proceeded, with the State calling Investigator Scott Gould. *Id.* at 99. He testified about a photo array procedure conducted on March 18, 2012. *See id.* at 100-01; *see also* S.R. at 163 (copy of photo array). Investigator Gould explained that he had met with B.C. while she was at the hospital shortly after the alleged rape. Tr. 102. He interviewed B.C. and then conducted the identification procedure. Investigator Gould testified that B.C. identified Petitioner during that procedure. *See id.* at 106. Finding Investigator Gould's testimony credible, Justice Affronti concluded that the identification procedure was not "impermissibly suggestive." *Id.* at 118-19.

## II.    Trial

Petitioner's case proceeded to trial in March 2013.  On the first day of trial, Justice Affronti and Petitioner sparred over whether Petitioner had been given a sufficient opportunity to obtain counsel.  *See* Tr. 126-31.  In the course of that conversation, Justice Affronti asked Petitioner whether he would like to have Attorney Sperano—who had appeared at trial—to represent him.  *Id.* at 130.  Petitioner initially declined, but after some discussion, he agreed to allow Attorney Sperano to represent him—with the caveat that it be "noted on the record that [he] wanted to fire him because he was incompetent from the beginning."  *Id.* at 149.

With the issue of representation resolved, the case proceeded to trial.   The State's case in chief consisted of the following evidence.  On March 17, 2012, Petitioner and B.C. met at a party and exchanged phone numbers.  *Id.* at 472.  The next day, they decided to meet, and B.C. visited Petitioner at his apartment that evening.  *Id.* at 473-76.  At trial, B.C. testified that Petitioner suggested that they go to his bedroom to watch TV.  *Id.* at 481.  When B.C. entered the bedroom, she sat at the end of the bed, observing that there were two TVs stacked on top of each other. Petitioner joined B.C. on the bed; they chatted and watched a movie on the "top TV."  Tr. 482. Once the movie ended, Petitioner proposed that they watch another movie, and B.C. agreed. Petitioner rose from the bed, turned off the "top TV," and turned on the "bottom" TV, which displayed a pornographic movie.  *Id.* at 483.  B.C. attempted to ignore it and continue talking with Petitioner.  *Id.* at 484.

At some point, B.C. received a call from her friend, who was intending to pick her up from Petitioner's home.  *Id.*  B.C. relayed this information to Petitioner, who, in response, "stood up in front of [her] and pushed [her] back on his bed," so that one of her arms was pinned behind her back.  *Id.* at 484-85.  B.C. testified that Petitioner pulled down her pants and positioned himself

with his head between her legs.  *Id.* at 485.  B.C. told Petitioner "to stop" and "get off" her, but Petitioner proceeded to perform oral sex on her despite her pleas.  *Id.* at 485-86.  B.C. was unable to fight back because Petitioner "had [her] pinned down."  *Id.* at 486.  Petitioner then pulled down his pants and penetrated B.C.'s vagina with his penis.  Tr. 487.  B.C. again asked Petitioner to stop, but "he wouldn't."  *Id.* at 488.  B.C. testified that, once Petitioner "finished with [her]," he went into the bathroom.  *Id.*  B.C. attempted to flee from the house.  Petitioner ran after her and tried to close the front door.  B.C. was able to push him away and run outside, just as her friend was driving up to Petitioner's home. B.C. got into the car and left.  *Id.* at 490.  B.C. disclosed to her friend that Petitioner had raped her.  *Id.* at 491.

Later that evening, B.C. went to the hospital, where she underwent a battery of tests and treatment protocols.  B.C. testified that, while at the hospital, she received a text message from Petitioner, which read:

> I am very sorry u don't have to talk to me aoymore [sic] or foreget [sic] about what happened just accepted [sic] my apology pllleazze [sic].

S.R. at 168.  B.C.'s friend, who had picked up B.C. from Petitioner's house, also testified at trial. She recounted picking up B.C.: "When I arrived there, [B.C.] was coming off the porch steps and she came and got in my car.  And I looked at her and asked her what was wrong, and she said nothing, and then she just started crying, and then she said, 'He raped me.'"  Tr. 627.  Initially, B.C. did not want to call the police, but her friend insisted.  *Id.* at 627-28.  B.C. was taken to the hospital thereafter.  *Id.* at 628.  The friend noted that B.C. had appeared "fine" when she was dropped off at Petitioner's house, but "after [she] picked [B.C.] up, she was totally different.  You could just see it in her face."  *Id.*

The State also called, *inter alia*, Debra Crasti, the nurse who examined B.C. after the alleged rape; Officer Schultz, who reiterated the substance of his testimony from the *Huntley*

hearing; Investigator Gould, who discussed the photo array and described the results of a search of Petitioner's home; and Heather Rice, a forensic biologist who testified that Petitioner's DNA matched DNA found in B.C.'s rape kit. Petitioner did not present any witnesses. *Id.* at 754.

The jury found Petitioner guilty on counts one, three, and four—first-degree rape, third-degree rape, and third-degree criminal sexual act. Tr. 827. The jury found Petitioner not guilty on count two, first-degree criminal sexual act. *Id.* Justice Affronti later set aside the third-degree rape conviction *sua sponte*, on the ground that it was a lesser included offense of the first-degree rape conviction. *Id.* at 932-93.

After trial, Justice Affronti found Petitioner to be subject to certain sentencing enhancements, deeming Petitioner to be a "persistent violent felony offender" for purposes of the first-degree rape conviction, and a "persistent felony offender" for purposes of the third-degree criminal sexual act conviction. *Id.* at 952. Justice Affronti sentenced Petitioner to concurrent indeterminate terms of 25 years to life for both charges. *Id.* at 953.

## III. Appeal

Petitioner filed a direct appeal to the Appellate Division, Fourth Department, which initially affirmed the convictions. *See People v. Pressley*, 68 N.Y.S.3d 270 (4th Dep't 2017) [hereinafter "*Pressley I*"]. However, upon reargument, the Appellate Division concluded that the trial court erred by "requiring [Petitioner] to proceed pro se on the [State's] motion to compel him to submit to a buccal swab for DNA testing." *People v. Pressley*, 70 N.Y.S.3d 439, 439 (4th Dep't 2018) [hereinafter "*Pressley II*"]. It remitted the matter to the trial court "for further proceedings on the [State's] motion following the assignment of counsel to represent defendant thereon." *Id.* at 440. On May 15, 2018, the trial court concluded that Petitioner was permissibly compelled to submit to a buccal swab, and granted the State's motion *nunc pro tunc*. S.R. at 410. On March

22, 2019, the Appellate Division affirmed the trial court's decision on the motion to compel. *People v. Pressley*, 94 N.Y.S.3d 917 (4th Dep't 2019) [hereinafter "*Pressley III*"]. Petitioner sought leave to appeal, which the Court of Appeals denied on June 12, 2019. S.R. at 443. On June 24, 2020, Petitioner filed the present action. ECF No. 1.

## LEGAL STANDARD

28 U.S.C. § 2254 allows a petitioner to challenge his imprisonment from a  state criminal judgment on the ground that it is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where the petitioner raises a claim that was adjudicated in state-court proceedings, he is only entitled to relief if that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1), (2).

"A principle is 'clearly established Federal law' for § 2254(d)(1) purposes only when it is embodied in a Supreme Court holding, framed at the appropriate level of generality." *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (internal quotation marks, brackets, and citations omitted). "A state court decision is 'contrary to' such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law or has decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Id.* (internal quotation marks omitted). "An unreasonable application occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case, so that the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." *Id.* (internal quotation marks and ellipses omitted).  In analyzing a habeas claim, "[f]ederal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with clear and convincing evidence." *Hughes v. Sheahan*, 312 F. Supp. 3d 306, 318 (N.D.N.Y. 2018) (internal quotation marks omitted).  "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Id.*

Where, as here, the petitioner is proceeding *pro se*,[6] the district court must read the pleadings liberally and construe them "to raise the strongest arguments they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

## DISCUSSION

Petitioner contests his convictions on five grounds.  First, there were several errors of state law committed during his criminal proceedings.  Second, Justice Affronti erred when he advised the jury at trial that Petitioner was in custody, had been unable to post bail, and was seated beside a Deputy Sheriff.  ECF No. 1 at 6.  Third, Justice Affronti violated Petitioner's right to counsel when he forced him to proceed *pro se* during part of the pretrial proceedings and then, at trial, compelled him to choose between acting *pro se* or accepting the representation of Attorney Sperano.  *Id.* at 8.  Fourth, Attorney Sperano did not provide effective assistance of counsel.  *Id.* at 10.  Fifth, there was insufficient evidence of forcible compulsion to support his conviction for first-degree rape.  *Id.* at 13.  The Court examines each argument in turn.

---

[6] Petitioner filed his petition *pro se*.  ECF No. 1.  Subsequently, the Court granted Petitioner's request for the appointment of counsel, ECF No. 23, and pro bono counsel filed a supplemental memorandum addressing "the denial of Petitioner's right to counsel during his pre-trial hearings."  ECF No. 25 at 3.  Pro bono counsel did not further brief the other issues raised in the petition.  Accordingly, the Court intends to otherwise review the petition liberally in accordance with its obligation to *pro se* litigants.

The Court thanks pro bono counsel for his participation and assistance in this matter.

## I.     Violations of State Law

Petitioner raises several issues of state law that require only brief comment.  Petitioner contends that the sentences for his convictions were harsh and excessive; that the jury verdicts were against the weight of the evidence; that he was sentenced as a persistent felony offender without the requisite state-law procedures; and that Justice Affronti did not comply with state law in handling a jury note received at trial.  *See* ECF No. 1 at 9, 13, 16.

Generally, habeas review does not extend to matters of state law.  "According to § 2254, a federal habeas court may only consider a petition if it claims 'a violation of the Constitution or laws or treaties of the United States.'"  *Chellel v. Miller*, No. CV-04-1285, 2008 WL 3930556, at *5 (E.D.N.Y. Aug. 21, 2008) (quoting 28 U.S.C. § 2254(a)).  In other words, "federal habeas corpus relief does not lie for errors of state law, absent a corresponding violation of federal constitutional rights."  *Cunningham v. Conway*, 717 F. Supp. 2d 339, 367-68 (W.D.N.Y. 2010) (internal quotation marks omitted).  Consequently, federal courts have routinely rejected claims for habeas relief premised on the state-law theories that Petitioner now raises.  *See, e.g.*, *Saracina v. Artus*, 452 F. App'x 44, 46 (2d Cir. 2011) (summary order) (claim that petitioner was "unlawfully adjudicated" as a "persistent felony offender"); *Glass v. Superintendent, E. Corr'l Facility*, No. 18-CV-517, 2021 WL 3888266, at *3 (N.D.N.Y. July 30, 2021) (claim that verdict was against the weight of the evidence). *Chelley v. New York*, 475 F. Supp. 3d 168, 178 (W.D.N.Y. 2020) (claim that sentence was unduly harsh or excessive); *Roberts v. Lamanna*, No. 19-CV-880, 2020 WL 5633871, at *6 n.9 (E.D.N.Y. Aug. 31, 2020) (claim that trial court failed to handle jury note in manner required by state law).  The Court cannot address any of Petitioner's claims to the extent they are grounded in violations of state law.

Granted, Petitioner attempts to reframe these arguments in terms of his federal constitutional rights, asserting that these state-law errors had the effect of violating his rights to due process and to a fair trial. *See* ECF No. 1 at 10, 16, 17. This Court does have the authority to "correct a misapplication of state law" if "such misapplication violates the Constitution, laws, or treaties of the United States." *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002). However, even if these claims could be reframed in a manner cognizable on federal habeas review, they still fail because Petitioner did not exhaust the claims on direct appeal.

Under § 2254(b)(1)(A), a federal court may not grant a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." In order to "satisfy § 2254's exhaustion requirement, a petitioner must present the substance of the same federal constitutional claims that he now urges upon the federal courts to the highest court in the pertinent state." *Aparicio v. Artuz*, 269 F.3d 78, 89-90 (2d Cir. 2001) (internal quotation marks, brackets, and citations omitted); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) ("Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." (internal brackets and quotation marks omitted)). Moreover, "[i]f a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred," the habeas court "must deem the claim procedurally defaulted." *Carvajal*, 633 F.3d at 104 (internal brackets omitted). "An applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim only by demonstrating cause for the default and prejudice or by showing that he is actually innocent of the crime for which he was convicted." *Id.* (internal quotation marks omitted).

During his direct appeal, Petitioner never raised the constitutional aspects of these state-law claims; he framed his arguments only in terms of state law.  *See generally* S.R. at 2-60 (brief before Appellate Division); *id.* at 364-75 (brief after remittitur); *id.* at 430-40 (brief to Court of Appeals).  Having failed to raise the constitutional claims on direct appeal, New York courts would now treat those claims as procedurally barred.  *See* N.Y. Crim. P. Law § 440.10(2)(c) (court must deny motion to vacate criminal judgment where defendant unjustifiably failed to raise ground on direct appeal); *see also, e.g.*, *Kirton v. Ercole*, No. 08-CV-719, 2009 WL 3644344, at *4 (N.D.N.Y. Oct. 28, 2009) (constitutional claim related to classification as persistent felony offender procedurally barred where not raised on direct appeal).

Therefore, the claims are procedurally defaulted, such that habeas review is barred unless Petitioner demonstrates "cause for the default and prejudice" or shows "that he is actually innocent of the crime for which he was convicted."  *Carvajal*, 633 F.3d at 104.  In none of his filings does Petitioner address these issues, let alone carry his burden to make the requisite showing.  *See* ECF Nos. 1, 25; *see also Allan v. Conway*, No. 08-CV-4894, 2012 WL 70839, at *9 (E.D.N.Y. Jan. 10, 2012) (petitioner failed to meet burden where he did not provide "any explanation for his failure to properly exhaust all of his claims in state court").  Furthermore, the Court can discern no reason why the failure to consider this claim will result in a fundamental miscarriage of justice.  As such, Petitioner is barred from obtaining habeas relief on these grounds.  *See Vargas v. Keane*, 86 F.3d 1273, 1280 (2d Cir. 1996) (claim barred where petitioner did not "attempt to show cause or prejudice" and the record did not "support a conclusion that the failure to grant relief will result in a 'fundamental miscarriage of justice'").

## II.   Comments to Jury

Petitioner argues that the trial court made several unnecessary and prejudicial comments at the start of the trial.   During *voir dire*, the trial court introduced potential jurors to the parties, but also proceeded to identify a Sheriff's deputy sitting next to Petitioner:

> Now, before I proceed with the allegations, the gentleman to [Petitioner's] left is a Monroe County Sheriff's Deputy . . . .   And I tell you that, ladies and gentlemen, because as you can see, and you'll certainly know as this trial proceeds, [Petitioner] is currently in the custody of the Monroe County Sheriff.
>
> Do not in any manner or any form draw any adverse or any unfavorable inference against him merely because he is in custody of the sheriff.   As you know, individuals who are accused of a crime are entitled to have bail set by the Court. And if the individual is unable to post the bail, then the only legal alternative is to continue the custody status of the defendant.   That's why he's here with the deputy sheriff.   Again, don't think about that and don't hold that against him.

Tr. 176.   Although Petitioner did not contemporaneously object to this comment, on appeal he argued that the comments deprived him of his right to a fair trial insofar as they implicitly conveyed to the jury that Petitioner "was too impoverished to make bail," was dangerous, or was a flight risk.   S.R. at 22 (internal quotation marks omitted).   The Appellate Division determined that the issue was not preserved in light of Petitioner's failure to object, and, regardless, "lack[ed] merit." *Pressley I*, 68 N.Y.S.3d at 271.   It found that neither the comments nor the "positioning of a Deputy Sheriff at the defense table" were prejudicial.   *Id.*   Petitioner renews his challenge on habeas review.   For two reasons, the Court finds that Petitioner's argument does not entitle him to relief.

First, the Appellate Division found that his argument was not preserved because he "made no objection to the preliminary instructions."[7]   *Pressley*, 68 N.Y.S.3d at 271.   This finding bars habeas review.   "[A] court may not grant a habeas petition if the state court determination provides

---

[7] The Appellate Division rejected Petitioner's argument both on preservation grounds and on the merits.   *Pressley I*, 68 N.Y.S.3d at 271.   Where, as here, "a state court says that a claim is 'not preserved for appellate review' and then rules 'in any event' on the merits, [the] claim is not preserved."   *Swail v. Hunt*, 742 F. Supp. 2d 352, 360 n.1 (W.D.N.Y. 2010).

an independent basis under state law for denying the federal claim, which adequately supports the result." *Purdie v. LaClaire*, No. 08-CV-5108, 2010 WL 2838523, at *4 (E.D.N.Y. June 7, 2010). Under New York law, "[p]arties are required to make specific contemporaneous objections at trial to preserve issues for appellate review." *Roberts*, 2020 WL 5633871, at *7; *see also Greene v. Brown*, No. 06-CV-5532, 2007 WL 1589449, at *20 (S.D.N.Y. June 4, 2007) (discussing rule in context of remarks by trial judge). It is "well-settled that New York's contemporaneous objection rule is an adequate and independent bar to federal habeas review." *Dick v. Bradt*, No. 09-CV-339, 2014 WL 2434489, at *9 (E.D.N.Y. May 29, 2014). Because the Appellate Division provided an adequate and independent basis for denying Petitioner's claimed error, federal habeas review is barred. *See Reyes v. Keane*, 118 F.3d 136, 138 (2d Cir. 1997) ("A state prisoner who fails to object to a jury instruction in accordance with state procedural rules procedurally forfeits that argument on federal habeas review.").

To be sure, "[a] federal court may review a claim that is procedurally barred by an independent and adequate state law ground if the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Bradt*, 2014 WL 2434489, at *8 (internal quotation marks omitted); *see also Lamanna*, 2020 WL 5633871, at *7. But again, Petitioner does not even attempt to make the requisite showing to overcome the procedural default. *See* ECF Nos. 1, 25.

Second, leaving aside the preservation issue, the Court agrees with the Appellate Division's conclusion that this claim fails on the merits. "Under the Fifth and Fourteenth Amendments, criminal prosecutions must be conducted within the bounds of fundamental fairness." *Daye v. Attorney General of State of N.Y.*, 712 F.2d 1566, 1570 (2d Cir. 1983). The Second Circuit has

held that "prejudicial intervention by a trial judge [can] so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause." *Id.*

In the case of *United States v. Rasheed*, 981 F.3d 187 (2d Cir. 2020), the Second Circuit addressed an issue analogous to that presented here—a trial judge's comments that the defendant was "in custody" and "in prison" because he had committed a "felony." *Rasheed*, 981 F.3d at 195. The judge also "drew the jurors' attention to the United States Deputy Marshal standing near [the defendant] in the courtroom, confirming that [he] was there because [the defendant]" was "in custody." *Id.* The judge had not consulted the parties about his intent to make these comments, but he "followed each of these remarks with an instruction that [the defendant's] custodial status should have no bearing on the verdict." *Id.* Although the Second Circuit found these remarks "problematic," it concluded that the judge "did not violate [the defendant's] right to a fair and impartial trial" and had not abused its discretion in denying the defendant's motion for a mistrial. *Id.* at 195-96. This was because the defendant had already "stipulated to the fact that he was recently in custody," and because the remarks were "followed immediately by unambiguous instructions that the fact of custody was not a permissible basis from which the jury could infer guilt." *Id.* at 196.

As in *Rasheed*, in this case the trial court made several remarks that could be viewed as "problematic." *Rasheed*, 981 F.3d at 195. Without apprising the parties of its intent, the court highlighted Petitioner's custodial status, his inability to pay bond, and the presence of a Sheriff's deputy. But, as in *Rasheed*, the court followed his remarks with contemporaneous instructions to the jury that it should not draw any inferences from those facts. *See* Tr. 176. In his final instructions, the trial court also emphasized that Petitioner was "presumed to be innocent" and that a verdict could only be based on the evidence presented at trial, rather than "speculations," "bias,"

or "prejudice." Tr. 787, 789-90.  In light of the "invariable assumption of the law that jurors follow

their instructions," *Rasheed*, 981 F.3d at 196, and absent any indication of an "overwhelming

probability that the jury [would] be unable to follow the court's instructions," *Licausi v. Griffin*,

460 F. Supp. 3d 242, 265 (E.D.N.Y. 2020) (internal quotation marks and ellipsis omitted), the trial

court's remarks did not violate Petitioner's right to a fair trial, and the Appellate Division did not

err in rejecting Petitioner's argument.[8]

Petitioner is not entitled to relief on this basis.

## III.    Right to Counsel at Pretrial Proceedings

On direct appeal, Petitioner contended that his Sixth Amendment right to counsel was

violated when Justice Affronti compelled him to represent himself in connection with (1) the

State's motion to compel the buccal swab, (2) the *Huntley* hearing, and (3) the *Wade* hearing.

Petitioner reasoned that his actions neither constituted a waiver of his right to counsel nor justified

forfeiture of that right.  *See* S.R. at 34-39.  Thus, he was entitled to be represented by counsel at

those proceedings, and Justice Affronti violated that right "by forcing [Petitioner] to self-

represent." *Id.* at 39.

In its December 22, 2017 decision, the Appellate Division agreed that Justice Affronti

violated Petitioner's right to counsel by requiring Petitioner to proceed *pro se* at the *Huntley*

---

[8] To the extent Petitioner contends that the stationing of a deputy next to him during trial was itself erroneous, *see* S.R. at 21-26, the Appellate Division's conclusion—that such conduct was not prejudicial—was neither contrary to nor an unreasonable application of clearly established law.  *See Pressley I*, 68 N.Y.S.3d at 271.  In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Supreme Court rejected a defendant's claim that he was denied a right to a fair trial when four armed state troopers were stationed in the first spectator's row for purposes of trial security.  The court found nothing inherently or actually prejudicial about the presence of the troopers.  *Holbrook*, 475 U.S. at 569-70.  Here, especially in light of the trial court's explanation about the deputy's presence and its admonition to the jury, the Appellate Division could reasonably reject that the otherwise unobtrusive presence of the deputy was prejudicial.  *See id.* ("[W]e simply cannot find an unacceptable risk of prejudice in the spectacle of four [armed and uniformed] officers quietly sitting in the first row of a courtroom's spectator section."); *King v. Rowland*, 977 F.2d 1354, 1358 (9th Cir. 1992) ("The presence of security guards does not automatically signal that a defendant is dangerous or culpable."); *see also Lopez v. Thurmer*, 573 F.3d 484, 495 (7th Cir. 2009) (favorably noting court's instructions to the jury in assessing prejudice of security measures).

hearing, "inasmuch as [Petitioner] did not waive his right to counsel at the hearing, nor did [his] conduct support a finding that he forfeited his right to counsel." *Pressley I*, 68 N.Y.S.3d at 271 (citation omitted).  Nevertheless, the Appellate Division found the error harmless, as "the evidence of guilt apart from [Petitioner's] statements [was] overwhelming." *Id.* at 272.  The Appellate Division did not address Petitioner's right to counsel in connection with the *Wade* hearing or the motion to compel.

Petitioner moved for reargument, which the Appellate Division granted. *See Pressley II*, 70 N.Y.S.3d at 439.  In an amended order, the Appellate Division agreed with Petitioner that he was wrongly compelled to proceed *pro se* in connection with the motion to compel. *Id.*  The court concluded that this error could not be "deemed harmless, inasmuch as the evidence apart from the DNA evidence is not overwhelming, and there is a reasonable possibility that the error contributed to the conviction." *Id.*  The Appellate Division therefore "remit[ted] the matter to Supreme Court for further proceedings on the [motion to compel] following the assignment of counsel to represent defendant thereon." *Id.* at 440.

On remittal, Petitioner was appointed new counsel. *See* S.R. at 386.  Counsel filed an opposition to the State's motion to compel, *id.* at 400-06, and a hearing was held before Supreme Court Justice Judith A. Sinclair. *Id.* at 407-12.  Justice Sinclair granted the motion to compel *nunc pro tunc*. *Id.* at 410, 413-14.

Following remittal, Petitioner filed another brief before the Appellate Division. *Id.* at 363-77.  Petitioner acknowledged that it could not "be reasonably argued that the [State's] application for the buccal swab was improperly granted" on remittal. *Id.* at 370.  Instead, Petitioner argued that (1) the Appellate Division had failed to address Petitioner's right to counsel with respect to the *Wade* hearing; and (2) the violations of Petitioner's right to counsel were not subject to

harmless-error analysis, insofar as they left Petitioner unable to "confer with counsel" on the "significance" of the rulings and the effect such evidence would have on the State's case at trial. *See id.* at 370, 372, 375.

On March 22, 2019, the Appellate Division affirmed the criminal judgment after remittal. *See Pressley III*, 94 N.Y.S.3d at 917. It stated that Petitioner "correctly concedes that there was no error in the proceedings following remittal."[9] *Id.* As for Petitioner's "remaining contentions," the court wrote that they were "not properly before us because they extend beyond the scope of that remittal and either were not raised by defendant prior to remittal or were previously considered by this Court." *Id.* Subsequently, Petitioner sought leave to appeal to the Court of Appeals, which was denied. S.R. at 430-40.

Petitioner now raises these issues in his petition. As an initial matter, the parties agree that Petitioner did not waive or forfeit his right to counsel during pretrial proceedings. As a result, Petitioner's Sixth Amendment right to counsel was violated when he was compelled to proceed *pro se* in connection with the *Wade* and *Huntley* hearings, as well as the motion to compel. *See* ECF No. 21-2 at 28; ECF No. 25 at 7. However, the parties disagree whether the Appellate Division properly concluded that (a) the violations are subject to harmless-error analysis, and (b) the errors were harmless (or properly remedied, in the case of the motion to compel).

Before delving into that analysis, the Court must again emphasize the deferential standard of review. A petitioner is only entitled to relief if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

---

[9] Petitioner disputes that his appellate counsel ever made such a "concession." ECF No. 1 at 19. As support, he cites a letter his appellate counsel wrote to that effect. *See id.* at 117. This dispute is a question of semantics more than substance. In her brief, Petitioner's appellate counsel wrote that it could not be reasonably argued that the motion to compel "was improperly granted." S.R. at 370. Whether one views this as a concession, as the Appellate Division did, or as simply a failure to challenge the ruling, as appellate counsel did, *see* ECF No. 1 at 118, it is undisputed that Petitioner did not raise any challenge to the procedure or outcome of the new hearing on the motion to compel.

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1), (2). An unreasonable application of a Supreme Court holding "must be objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted) (stating that "even 'clear error' will not suffice"). That is, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 419-20.

Even if a state court's decision lacks an explicit rationale, the Court's review remains highly deferential. *See Golb v. Attorney General of the State of New York*, 870 F.3d 89, 99 (2d Cir. 2017) ("When a state court rejects a constitutional claim without explanation . . . [the habeas court's] job is to determine what arguments or theories supported or . . . *could have supported* the state court's decision, and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." (internal quotation marks and brackets omitted)); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011) (stating that the petitioner must show "there was no reasonable basis for the state court to deny relief"). Because the Court of Appeals denied Petitioner's request for review, the Court's review focuses on the Appellate Division's decisions. *See Licausi v. Griffin*, 460 F. Supp. 3d 242, 258 (E.D.N.Y. 2020) ("Courts examine the 'last reasoned decision' by the state courts in determining whether a federal claim was adjudicated on the merits.").

The first question the Court must answer is whether the Appellate Division unreasonably applied Supreme Court precedent when it held that the violations of Petitioner's right to counsel were subject to harmless-error analysis.

"In some of its earlier decisions, the Supreme Court had held that the assistance of counsel is among those constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Acosta v. Raemisch*, 877 F.3d 918, 931-32 (10th Cir. 2017) (internal quotation marks omitted). For example, in *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court wrote that "constitutional error" existed "without any showing of prejudice when counsel was either totally absent[] or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n.25. "More recently, however, the Court has explained that not all constitutional violations, including Sixth Amendment violations, require automatic reversal." *Acosta*, 877 F.3d at 932; *see, e.g.*, *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988) (declining to adopt "an automatic rule of reversal for violations of the Sixth Amendment right"); *Acosta*, 877 F.3d at 932-33 (collecting cases).

Instead, the Supreme Court has "distinguished between two classes of constitutional errors: the vast majority, denominated 'trial errors,' which are subject to harmless error review, and a very limited class of errors, called 'structural,' which require automatic reversal regardless whether the error had any appreciable effect on the outcome of the trial." *Yarborough v. Keane*, 101 F.3d 894, 896 (2d Cir. 1996). "Sixth Amendment violations that pervade the entire proceeding" are structural errors. *Satterwhite*, 486 U.S. at 256. A "less significant denial of the right to counsel . . . [may be] subject to harmless error review," however. *Yarborough*, 101 F.3d at 897. Under this taxonomy, a court must "look not only at the right violated, but also at the particular nature, context, and significance of the violation" to determine "whether an error is properly categorized

as structural." *Id.*; *see also Sweeney v. United States*, 766 F.3d 857, 860-61 (8th Cir. 2014); *Dallio v. Spitzer*, 343 F.3d 553, 568-69 (2d Cir. 2003) (Katzmann, J., concurring).  In the recent case of *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), the Supreme Court articulated "three broad rationales" for deeming an error structural.  "First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Weaver*, 137 S. Ct. at 1908.  "Second, an error has been deemed structural if the effects of the error are simply too hard to measure." *Id.*  Third, "an error has been deemed structural if the error always results in fundamental unfairness." *Id.*

The paradigmatic structural error is the "total deprivation of the right to counsel at trial." *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).  Because "[t]he entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant," the total deprivation of counsel "affect[s] the framework within which the trial proceeds" and prevents the trial from "reliably serv[ing] its function as a vehicle for determination of guilt or innocence." *Id.* at 309-10.  In a similar vein, counsel's conflict of interest throughout the entire criminal proceeding constitutes a structural error. *See Holloway v. Arkansas*, 435 U.S. 475 (1978).  Not only does such a conflict infect the entire scope of representation, but it is "virtually impossible" to engage in an intelligent, nonspeculative, and evenhanded harmless-error analysis for so pervasive an error. *See id.* at 490-91.  The same applies to the deprivation of a defendant's right to counsel of his choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 150-51 (2006) (declining to apply harmless-error analysis because "[i]t is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings," rendering the "[h]armless-error analysis" a "speculative inquiry into what might have occurred in an alternate universe").

In addition, the Supreme Court has held that the absence of counsel at certain stages of the criminal proceeding may rise to structural error if that absence serves to "affect[]" or "contaminate[]" the rest of the proceeding. *Satterwhite*, 486 U.S. at 257. Thus, in *Hamilton v. Alabama*, 368 U.S. 52, 53-54 (1961), the Supreme Court found a structural error where counsel was not appointed at time of arraignment, because defenses not asserted at that time were lost. In this way, the deprivation of the right to counsel at a single, discrete stage may "contaminate[]" the rest of the proceeding. *Satterwhite*, 486 U.S. at 257.

By contrast, the Supreme Court has "permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial." *Id.* In *Satterwhite*, the court considered the case of a defendant whose attorney was not notified that the trial court had ordered the defendant to be examined by a psychologist. *See id.* at 252. The Supreme Court found that the defendant's right to counsel had been violated as a result and it proceeded to undertake a harmless-error analysis. *See id.* at 254, 258-59. It declined the defendant's request for "an automatic rule of reversal for [these sorts of] violations of the Sixth Amendment right," reasoning that a reviewing court was able to "make an intelligent judgment about whether the erroneous admission of psychiatric testimony" might affect the factfinder's decision. *Id.* at 257-58.

Similarly, the Supreme Court applied harmless-error analysis where the defendant was deprived of his right to counsel in connection with a pre-indictment preliminary hearing. *See Moore v. Illinois*, 434 U.S. 220, 222-23 (1977). At that hearing, the complainant identified the defendant. *See id.* at 223. The court held that the defendant's right to counsel was violated when he was subjected to a pretrial corporeal identification "conducted after the initiation of adversary judicial criminal proceedings and in the absence of counsel." *Id.* at 231. The court remanded the

case for "a determination of whether the failure to exclude that evidence was harmless constitutional error." *Id.* at 232.  The Supreme Court has applied harmless-error analysis to other Sixth Amendment violations involving discrete hearings or proceedings.  *See United States v. Owens*, 407 F.3d 222, 227 (4th Cir. 2005) (collecting cases).

In his initial submissions to the Appellate Division, Petitioner challenged the deprivation of counsel in relation to three discrete matters: the *Wade* hearing, the *Huntley* hearing, and the motion to compel.  *See* S.R. at 13 (framing the question presented as whether Justice Affronti erroneously "forced [Petitioner] to self-represent during critical stages of the pretrial proceedings"); *id.* at 31 (arguing that Petitioner's right to counsel was violated when he was deprived of counsel for certain "critical stages [of] the pretrial proceedings").  Those matters correspond to the (allegedly erroneous) admission of three discrete pieces of evidence: respectively, the testimony of Officer Schultz (who described Petitioner's demeanor and statements upon his arrest on March 21, 2012), B.C.'s identification of Petitioner via a photo array, and the evidence concerning Petitioner's DNA.  In his original briefing, Petitioner did not argue that counsel's absence in these three discrete matters impacted the rest of the criminal proceedings, except insofar as Attorney Sperano's absence left him unprepared for trial.  *See* ECF No. 1 at 107 (asserting that Attorney Sperano's absence during pretrial proceedings "had something of a spill-over effect" because it undermined his "effectiveness in representing" Petitioner at trial).  That is, Petitioner did not assert that the eight months in which he was without counsel had any other "spillover" effect on his ability to pursue his defense, develop a trial strategy, investigate matters, review discovery, or decide whether to plea.

If the Court were to assess Petitioner's claim as he framed it in his original submissions, the Court would have no trouble concluding that the Appellate Division did not act unreasonably

when it found Petitioner's Sixth Amendment claim susceptible to harmless-error analysis. Because each of the matters in which Petitioner proceeded *pro se* involved a discrete piece of evidence, a court could readily connect each instance in which Petitioner was deprived of counsel to "the erroneous admission of particular evidence at trial." *Satterwhite*, 486 U.S. at 257.  A court would not be required to "speculate upon what effect . . . different intangibles might have had," *Gonzalez-Lopez*, 548 U.S. at 151, but could make a straightforward, "intelligent [inquiry] about whether the erroneous admission" of the evidence "might have affected" the jury.  *Satterwhite*, 486 U.S. at 258.  Harmless-error analysis is appropriate in those circumstances.  *See id.*

Petitioner's claim that the absence of counsel had a "spillover effect"—of undermining Attorney Sperano's effectiveness at trial—does not change this analysis.  Like the erroneous admission of evidence, courts are readily equipped to assess the adequacy of counsel's preparation for trial and the prejudice resulting therefrom.[10]  *See Gonzalez-Lopez*, 548 U.S. at 150-51 (noting that, unlike the denial of choice of counsel, a court is competent to assess how counsel's "identifiable mistakes" at trial may have "affected the outcome"); *see, e.g.*, *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (analyzing whether counsel's failure to "prepare for trial" prejudiced the defendant's case); *Lujan v. Norwood*, 62 F. App'x 304, 308-09 (10th Cir. 2003) (summary order) (same).

Accordingly, at least with respect to how Petitioner originally framed his argument, the Appellate Division could reasonably conclude that the consequences flowing from the deprivation of counsel in three pretrial matters were sufficiently discrete and quantifiable as to permit harmless-error analysis.  *See Weaver*, 137 S. Ct. at 1908; *Satterwhite*, 486 U.S. at 257.

---

[10] The Court further addresses this issue in Section IV, *infra*.

The next question is whether the Appellate Division's harmless-error analysis was unreasonable. *See Brown v. Davenport*, 142 S. Ct. 1510, 1520 (2022) (stating that, to be entitled to habeas relief, a petitioner must show, *inter alia*, that the state court's "harmless-error determination" was unreasonable under Section 2254(d)(1)). It was not. The denial of counsel with respect to the motion to compel was reasonably remedied through a new hearing. *See Pressley III*, 94 N.Y.S.3d at 917; *see also Carracedo v. Artuz*, 81 F. App'x 741, 742-43 (2d Cir. 2003) (summary order) (state court did not unreasonably apply Supreme Court precedent by ordering new suppression hearing as remedy for deprivation of right to counsel). As for the *Wade* and *Huntley* hearings, the Court cannot say that "no fairminded jurist could reach the [Appellate Division's] conclusion" under the Supreme Court's precedent. *Brown*, 142 S. Ct. at 1525 (internal quotation marks and brackets omitted). The fact that Petitioner and B.C. engaged in sexual intercourse on the evening of March 18, 2012 was unequivocally established by the DNA evidence. Thus, B.C.'s identification of Petitioner via the photo array—which was adjudicated at the *Wade* hearing—was merely cumulative. And, although arguably more probative, the evidence of Petitioner's furtive behavior and inculpatory statements during his arrest—which was recounted by Officer Schultz and adjudicated at the *Huntley* hearing—were likewise cumulative. Neither on appeal nor in his petition did Petitioner argue that B.C. suffered from serious credibility issues. B.C.'s testimony—that she was forcibly violated by Petitioner—was supported circumstantially by the observations of other witnesses. Her friend testified that she noticed a significant change in mood when she picked up B.C. from Petitioner's home. *See* Tr. 627-28. B.C. immediately began crying and disclosed the rape when her friend asked "what was wrong." *Id.* at 627. In addition, the nurse examiner observed that B.C. was "cooperative" and "controlled" during the

examination, but noticed that her "hand was trembling." *Id.* at 641.  Most significant, however, is Petitioner's own text message to B.C. soon after the alleged rape.  He wrote:

> I am very sorry u don't have to talk to me aoymore [sic] or foreget [sic] about what happened just accepted [sic] my apology pllleazze [sic].

S.R. at 168.  The text message strongly corroborates B.C.'s allegations, and Petitioner has never articulated a more benign interpretation of it.  Accordingly, given the other strong evidence supporting B.C.'s allegations, the Appellate Division could reasonably find the absence of counsel at the *Huntley* and *Wade* hearings harmless. At the very least, the Appellate Division's conclusion was not so unreasonable as to permit habeas relief.  *See Brown*, 142 S. Ct. at 1530.

There is an added wrinkle in this case that must be addressed, however.  After remittal, Petitioner "supplement[ed]" his Sixth Amendment arguments in a manner directly bearing on the issues under consideration.  S.R. at 369.  For the first time, Petitioner argued that a consequence of the deprivation of his right to counsel was that he was unable to "confer with counsel on the significance" of the rulings and the effect those rulings should have "upon how the defense of the case was handled." *Id.* at 370, 375.  Petitioner noted that he was unable to meaningfully confer with counsel regarding his defense "until the trial was all but being conducted." *Id.* at 377.

Petitioner's supplemental argument presents a closer call as to whether harmless-error analysis is appropriate.  To determine whether Petitioner's inability to confer with counsel in the months leading up to trial constituted harmful error, a court might need to engage in a more speculative inquiry into prejudice, akin to the denial of choice of counsel in *Gonzalez-Lopez*.  As the *Gonzalez-Lopez* court noted, "[d]ifferent attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument." *Gonzalez-Lopez*, 548 U.S. at 150.  All of these "myriad aspects of representation" might evolve over the

course of pretrial proceedings, and it is "impossible to know" what a hypothetical defense attorney would have counseled in response to Justice Affronti's rulings.  *Id.*  Perhaps this attorney would have counseled Petitioner to plea, or perhaps he would have sought to focus his investigation and strategy on the issue of consent.  The Court could only speculate.

Still, despite the absence of counsel during some pretrial proceedings, Petitioner was not wholly deprived of the guiding hand of an attorney.  Petitioner initially had the assistance of Attorney Sperano in obtaining discovery and in deciding which pretrial issues to raise via a pretrial omnibus motion.  *See* S.R. at 97-116.  Petitioner never argued on direct appeal that, absent counsel, he was denied discovery or deprived of the opportunity to raise any defense before trial.  Nor did Petitioner argue that he would have been interested in a plea or would have pursued a different strategy had he had an attorney to counsel him on Justice Affronti's rulings.  Simply put, Petitioner ascribed no prejudicial effect to his inability to confer with counsel.  *See* S.R. at 370-75.

More importantly, although Attorney Sperano left the case for several months, beginning in October 2012, he acted as standby counsel, *see* Tr. 92, 96, and at trial, he formally represented Petitioner.  The fact that the same attorney represented Petitioner during the early pretrial proceedings and at trial is significant in determining whether harmless-error analysis is appropriate.  Unlike a case involving a total denial of counsel, a court need not ponder how a hypothetical attorney's assistance may have benefitted Petitioner; a court can simply assess whether the absence of a *specific attorney* from the case for several months prejudiced Petitioner's ability to investigate, strategize, negotiate a plea, defend himself, etc.  And a court is well-equipped to determine whether Attorney Sperano's appointment at trial was sufficient to remedy any harm that Petitioner suffered during his absence.  *Cf. Jones v. Cuomo*, 254 F. App'x 6, 7-8 (2d Cir. 2007) (summary order) (concluding that state trial court's failure to appoint counsel "during the first

eighteen months" of the defendant's criminal proceedings was adequately "remedied by the subsequent appointment of counsel a full eleven months before trial began").  If Attorney Sperano's absence in the intervening months caused Petitioner prejudice, one would expect it to do so in tangible ways that could be analyzed like any other claim for ineffective assistance of counsel.  *See id.* at 8 (assessing defendant's claim that late appointment of counsel prevented him from bringing speedy trial motion).  Indeed, Petitioner *was* able to raise such an argument on direct appeal: Attorney Sperano's absence rendered him unprepared for trial.  *See* S.R. at 46-47.  As the Supreme Court noted in *Gonzalez-Lopez*, courts are competent to assess the "mistakes committed by the actual counsel" and trace how those mistakes "affected the outcome."  *Gonzalez-Lopez*, 548 U.S. at 150-51.  Thus, it would not be unreasonable to declare this a situation in which harmless-error review was feasible.  Moreover, it would not be unreasonable to find that the error was harmless or did not otherwise merit relief: Petitioner fails to allege that, notwithstanding the appointment of Attorney Sperano at trial, an unremedied harm persisted as a result of his earlier inability to confer with counsel.  *See* S.R. at 370-75.

Ultimately, having considered the state of Supreme Court precedent and reviewed the record in this case, the Court cannot grant Petitioner habeas relief on this supplemental argument. The first obstacle is that the Appellate Division may have viewed Petitioner's supplemental argument as unpreserved.  In rejecting Petitioner's arguments after remittal, the court wrote that Petitioner's supplemental arguments were "not properly before" it because they "extend[ed] beyond the scope of that remittal and either" (a) "were not raised by defendant prior to remittal" or (b) "were previously considered by this Court."  *Pressley III*, 94 N.Y.S.3d at 917.  To the extent the Appellate Division refused to consider Petitioner's supplemental argument because it was not

raised earlier, that ruling operates as an independent basis to deny relief. *See LaClaire*, 2010 WL 2838523, at *4.

Even if the Appellate Division refused to consider the supplemental argument because the court believed it had already resolved it on the merits, for the reasons just discussed, this Court declines to grant habeas relief. Undoubtedly, there are certain aspects of Petitioner's deprivations of counsel that favor a structural-error approach, but there are also certain facts that favor harmless-error analysis. Given the unique, case-specific complications of Petitioner's situation, it is not surprising that prior Supreme Court precedent has not squarely addressed whether the deprivations of counsel that Petitioner suffered are susceptible to harmless-error analysis, let alone whether such deprivations amount to harmful error. It is precisely in such a circumstance that habeas relief is inappropriate. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (internal quotation marks and brackets omitted)); *see also Brown*, 142 S. Ct. 1528-30 (stating that deferential habeas review applies to state court's determination that error is harmless). The Supreme Court has emphasized that the application of a "general standard to a specific case" demands "a substantial element of judgment." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Where, as here, the rule is "more general," state courts must be afforded "more leeway" in reaching "outcomes in case-by-case determinations." *Id.* Because "fairminded jurists could disagree on the correctness of" the Appellate Division's decision, Petitioner is not entitled to relief on his supplemental argument. *Harrington*, 562 U.S. at 101 (internal quotation marks omitted); *see also Brown*, 142 S. Ct. at 1530.

Accordingly, the deprivations of counsel of which Petitioner complains do not warrant habeas relief.[11]

## IV.    Ineffective Assistance of Counsel

On direct appeal, Petitioner argued that Attorney Sperano provided ineffective assistance of counsel in four respects.  First, Attorney Sperano was unaware that he could obtain expert services under state law if Petitioner could not afford them.  S.R. at 47-48.  Second, Attorney Sperano was unaware of New York law concerning inconsistent verdicts.  *Id.* at 48-49.  Third, he was unprepared for trial.  *Id.* at 46-47.  Fourth, Attorney Sperano failed to object when Justice Affronti sentenced Petitioner as a persistent felony offender without adhering to the statutory procedures.  *Id.* at 49-50.  The Appellate Division denied Petitioner's claims of ineffective assistance of counsel and concluded that Attorney Sperano "provided meaningful representation at trial."[12]  *Pressley I*, 68 N.Y.S.3d at 272.  Petitioner renews his arguments in his petition.  ECF No. 1 at 10-13.

Petitioner is not entitled to habeas relief.  To establish a claim for ineffective assistance of counsel under the Sixth Amendment, a petitioner must show both "(1) that counsel's representation

---

[11] Separately, Petitioner argued on appeal that Justice Affronti erroneously assigned Attorney Sperano to represent him after he had been discharged as retained counsel.  *See* S.R. at 37-38, 438.  Petitioner asserted that it was either *per se* improper to appoint Attorney Sperano or, at the least, inappropriate to do so without first inquiring into Petitioner's complaints regarding Attorney Sperano's competence and preparations for trial.  *See id.* at 37-39.  This claim does not merit relief.  Petitioner cites no Supreme Court precedent establishing that it is *per se* improper for a trial court to appoint an attorney merely because that attorney had been previously discharged as retained counsel.  And even if Justice Affronti's lack of inquiry could be deemed an error of constitutional magnitude, Petitioner would need to show that he received ineffective assistance of counsel as a result.  *See Cantoni v. Leclair*, No. 12-CV-4353, 2015 WL 518226, at *14 (S.D.N.Y. Feb. 9, 2015) (collecting cases).  This is because, as an indigent defendant, Petitioner had a right to "adequate representation," not a right to "have the Government pay for his preferred representational choice."  *Luis v. United States*, 578 U.S. 5, 12 (2016).  As the Court discusses in Section IV, *infra*, Petitioner's claims for ineffective assistance of counsel are not meritorious.

[12] The Appellate Division did not directly address all of Petitioner's claims of ineffective assistance of counsel.  Regardless, this Court's task is to "determine what arguments or theories could have supported the state court's decision[,] and then [to] ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  *Cullen v. Pinholster*, 561 U.S. 170, 188 (2011) (internal brackets and ellipsis omitted).

was objectively deficient, and (2) ensuing prejudice." *Boyland v. Artus*, 734 F. App'x 18, 20 (2d Cir. 2018) (summary order); *see generally Strickland v. Washington*, 466 U.S. 668 (1984). "At the first step, courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. At the second, they ask not whether counsel's error had some conceivable effect on the outcome of the proceeding, but whether it so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Boyland*, 734 F. App'x at 20 (internal quotation marks and citations omitted).

Petitioner's arguments can be resolved in short order, as he fails to articulate any prejudice flowing from these alleged errors. Petitioner faults Attorney Sperano for failing to secure funding to retain a DNA expert, S.R. at 48, but presents no evidence that such an expert would have provided exculpatory testimony. *See, e.g.*, *Cruz v. Griffin*, No. 16-CV-8998, 2019 WL 6220806, at *13 (S.D.N.Y. Oct. 24, 2019) ("[B]ecause Petitioner has failed to make a specific proffer as to what relevant testimony or analysis a medical expert might have offered, he cannot demonstrate prejudice."). Petitioner alleges that Attorney Sperano incorrectly objected to the verdicts as inconsistent, S.R. at 48-49; Tr. 831, but fails to explain how an incorrect objection amounts to ineffective assistance. *See Brown v. Brown*, 847 F.3d 502, 514 (7th Cir. 2017) ("Pursuit of unsuccessful arguments . . . does not show ineffective assistance of counsel.").

Petitioner next argues that Attorney Sperano was unprepared for trial insofar as he did not remain apprised of the proceedings or keep in contact with Petitioner during his absence from the case. As support, Petitioner cites evidence that (a) Attorney Sperano objected to the prosecutor's reference to Officer Schultz's testimony during her opening statement, despite the fact that Justice Affronti had ruled such testimony admissible at the *Huntley* hearing, ECF No. 1 at 107; Tr. 463-64; (b) Attorney Sperano had not reviewed the State's *Sandoval* submissions prior to trial, *see* S.R.

at 39; Tr. 143; and (c) Attorney Sperano had not spoken with Petitioner since the October 2012 *Wade* hearing, S.R. at 39; Tr. 132.  But because Petitioner does not articulate how the claimed unpreparedness, even if established, prejudiced his defense at trial, his claim fails.  *See Hernandez v. Artus*, No. 09-CV-5694, 2020 WL 2769404, at *11 (E.D.N.Y. May 28, 2020) (collecting cases); *Slevin v. United States*, No. 98-CV-904, 1999 WL 549010, at *5 (S.D.N.Y. July 28, 1999) ("Petitioner's conclusory allegations that counsel evinced 'a general lack of preparation' do not demonstrate that absent the alleged errors, the outcome of the trial would have been different.").

That leaves Petitioner's claim that Attorney Sperano failed to object when Justice Affronti sentenced Petitioner as a persistent felony offender without adhering to the statutory procedures. New York law provides for sentencing enhancements for "two classes of persistent felony offenders: (1) persistent violent felony offenders, and (2) persistent felony offenders."  *Brown v. Greiner*, 409 F.3d 523, 526 (2d Cir. 2005).  There are robust statutory procedures that must be followed to impose these enhanced sentences.  *See* N.Y. Crim. P. Law §§ 400.16, 400.20. Substantively, for both classifications, the sentencing court must find that the defendant had previously been convicted of certain predicate offenses, *see* N.Y. Penal Law §§ 70.08(1)(a), 70.10(a), and, in the case of the "persistent felony offender" classification, must find that "the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest." *Id.* § 70.10(2); *see also Windley v. Lee*, No. 11-CV-1275, 2013 WL 2350431, at *3 (S.D.N.Y. May 16, 2013) (noting that, unlike the "persistent violent felony offender" classification, the "persistent felony offender" classification is discretionary).

Petitioner does not dispute that Justice Affronti complied with the statutory procedures before classifying Petitioner as a persistent violent felony offender with respect to his rape

conviction. *See* S.R. at 56-57. Those procedures included a hearing, at which Justice Affronti concluded that Petitioner had been convicted of the necessary predicate offenses. *See* Tr. 925-31; S.R. at 304; *see also* N.Y. Penal Law § 70.08(1)(a). Those same convictions likewise constituted the necessary predicates for classification as a persistent felony offender. *See* N.Y. Penal Law § 70.10(1)(a), (b). But, as Petitioner points out, Justice Affronti did not conduct a *separate* hearing to address the "persistent felony offender" enhancement, as required by New York Criminal Procedure Law § 400.20. Instead, Justice Affronti addressed the issue at sentencing. At sentencing, Attorney Sperano argued that Justice Affronti should not impose a persistent felony offender sentence given the acquittal on one of Petitioner's charges. *See* Tr. 942-43. Justice Affronti disagreed. Relying on his observations at trial, probation's report, and the evidence from the "persistent violent felony offender" hearing, he concluded that a persistent felony offender sentence was appropriate in light of Petitioner's "long extensive and lengthy [criminal] history." *Id.* at 952.

Although he received a full evidentiary hearing to determine his prior convictions and had an opportunity to address the enhancement at sentencing, Petitioner argues that Attorney Sperano should have objected to Justice Affronti's noncompliance with Section 400.20. S.R. at 49.

Again, Petitioner fails to articulate any prejudice resulting from Attorney Sperano's failure to object. Petitioner concedes that, under state law, the remedy for "non-compliance with [the] statutory procedure" is "vacatur of the persistent [] felony sentence with remand for a new hearing." *Id.* at 58-59; *see, e.g.*, *People v. Ruffins*, 776 N.Y.S.2d 405, 407 (4th Dep't 2004). Petitioner does not contend that, upon such a remand, he could have avoided designation as a persistent felony offender: he does not dispute that he has been convicted of the necessary predicate offenses, and he fails to identify any information he would raise on remand that might alter whether

the enhancement is in "the public interest" under Penal Law § 70.10(2).  Consequently, Petitioner

has not demonstrated prejudice.  *See United States v. DeJesus*, 509 F. App'x 12, 13 (2d Cir. 2013)

(summary order) (defendant did not suffer prejudice due to attorney's failure to seek resentencing

in light of intervening Supreme Court decision, where defendant could not show "a reasonable

probability that, but for counsel's conduct, the result on resentencing would have been different");

*United States v. Robinson*, 354 F. App'x 518, 520 (2d Cir. 2009) (summary order) (no prejudice

resulting from attorney's failure to emphasize sentencing court's discretion under *United States v.*

*Booker*, 543 U.S. 220 (2005), since defendant could not "demonstrate that any remand, upon which

his counsel would inform the sentencing judge of the realities of a post-*Booker* world, would likely

result in a materially different sentence").

## V.   Insufficiency of the Evidence

Finally, Petitioner contends that there was insufficient evidence to establish the element of

"forcible compulsion" for purposes of the rape offense.  *See* S.R. at 50.  The Court disagrees.

"When a federal habeas petition challenges the sufficiency of the evidence to support a

state-court conviction," the habeas court's standard is "twice-deferential."  *Santone v. Fischer*, 689

F.3d 138, 148 (2d Cir. 2012).  "A state court directly reviewing a jury verdict of guilty must,

consistent with United States Supreme Court precedent, view the evidence in the light most

favorable to the prosecution and must not uphold a challenge to the sufficiency of the evidence if

any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt."  *Id.* (internal quotation marks and brackets omitted).  "And the federal court in a habeas

proceeding may not overturn the state-court decision rejecting a sufficiency challenge unless the

decision was objectively unreasonable."  *Id.* (internal quotation marks, brackets, and ellipsis

omitted).  "When conducting a review for sufficiency of the evidence, federal courts must look to

state law for the substantive elements of the criminal offense." *Sanders v. Fischer*, No. 16-CV-4832, 2021 WL 3373127, at *9 (E.D.N.Y. Aug. 3, 2021) (internal quotation marks omitted).

Here, the Appellate Division correctly held that "[t]he evidence, viewed in the light most favorable to the [State], [was] legally sufficient to establish that [Petitioner] engaged in sexual intercourse with [B.C.] by forcible compulsion." *Pressley I*, 68 N.Y.S.3d at 272 (internal citation omitted). Under New York law, a person is guilty of rape in the first degree when he "engages in sexual intercourse with another person" by "forcible compulsion." N.Y. Penal Law § 130.35(1). By statute, "forcible compulsion" is defined as follows:

Forcible compulsion means to compel by either:

    a. use of physical force; or

    b. a threat, express or implied, which places a person in fear of immediate death or physical injury to [herself] . . . or in fear that [she] . . . will immediately be kidnapped.

N.Y. Penal Law § 130.00(8)(a)-(b) (internal quotation marks omitted).

At trial, B.C. testified that Petitioner used both hands to "push[] [her] back on his bed" when she told him she was being picked up. Tr. 484. As a result, one of B.C.'s arms was pinned behind her back, and both her legs were thrown up into the air. *Id.* at 485. Petitioner "grabbed hold" and "pulled [] down" B.C.'s pants before thrusting his head into her pubic area. *Id.* B.C. was fearful Petitioner "might hurt" her and told Petitioner to "stop" and "get off" her. *Id.* Though she continued to protest, Petitioner proceeded to force his penis into B.C.'s vagina until he ejaculated. *See id.* at 487-88. B.C. was unable to move or resist because Petitioner had "[her] pinned down." *Id.* at 488.

Viewed in the light most favorable to the State, the evidence demonstrates that Petitioner used physical force to pin B.C. down and force her to engage in sexual intercourse, which is

sufficient to establish the element of forcible compulsion.  *See, e.g.*, *People v. Hadfield*, 990 N.Y.S.2d 683, 686 (3d Dep't 2014) (element satisfied where victim testified that defendant "pinned her arms above her head, removed her underwear and, despite her continued protests, engaged in anal sex with her"); *People v. Simmons*, 717 N.Y.S.2d 152, 152 (1st Dep't 2000) ("The element of forcible compulsion was established by evidence that the complainant repeatedly said 'no' and attempted to push defendant off as he climbed on top of her and pinned her down."); *People v. Hodges*, 612 N.Y.S.2d 420, 421 (2d Dep't 1994) (element established where "defendant laid on top of the complainant, so that she could not push him off, and forced her to engage in sexual intercourse with him").  Habeas relief is not justified on this claim.

## CONCLUSION

Accordingly, Petitioner's request for habeas relief is DENIED and his petition (ECF No. 1) is DISMISSED.  Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is DENIED.  The Clerk of Court shall close the case.

IT IS SO ORDERED.

Dated: June 27, 2022
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York